V–1 OIL COMPANY, aka V–
1 Propane, Respondent,

v.

DEPARTMENT OF ENVIRONMENTAL
QUALITY, Division of Solid and Haz-
ardous Waste; Diane R. Nielsen, in her
Capacity as Executive Director; Dennis
R. Downs, in his Capacity as Director;
Utah Solid and Hazardous Waste Con-
trol Board; Kent P. Gray, in his Capaci-
ty as Executive Secretary (UST); and
David O. McKnight, in his Capacity as
Hearing Officer, Petitioners.

No. 950244.

Supreme Court of Utah.

May 20, 1997.

Peter Stirba, Benson L. Hathaway, Salt Lake City, for respondent.

Jan Graham, Atty. Gen., Carol Clawson, Solicitor Gen., Laura J. Lockhart, Asst. Atty. Gen., Salt Lake City, for petitioners.

## ON CERTIORARI TO THE UTAH COURT OF APPEALS

STEWART, Associate Chief Justice:

The issue before us is whether an administrative agency, in this case the Solid and Hazardous Waste Control Board (the "Board"), can appoint an agency employee to preside at a formal hearing to decide whether a party before that agency, in this case V–1 Oil Company, failed to remediate leakage from one of its underground storage tanks. The officer appointed by the Board to conduct the hearing, David O. McKnight, also worked as a part-time staff attorney within the division that was charged with investigating and prosecuting such violations. Although his duties as staff attorney were structurally segregated from the branch of the division conducting investigations and prosecutions of underground storage leaks,

V–1 asserted that McKnight was biased and challenged his appointment. The Board refused to order McKnight's recusal. V–1 then petitioned the Utah Court of Appeals for an extraordinary writ. That Court held that McKnight could not sit. *V–1 Oil Co. v. Department of Envtl. Quality*, 893 P.2d 1093, 1097 (Utah.Ct.App.1995) ("*V–1 Oil Co. I* "). We granted a petition for a writ of certiorari to review that decision. 910 P.2d 425 (Utah 1995). We reverse.

## I. BACKGROUND

The dispute in this case arose out of a report of contamination by a contractor performing a tank tightness test at one of V–1's service stations in Salt Lake County. A number of administrative entities within the Department of Environmental Quality ("DEQ") became involved in the investigation of the contamination report. As it is important to an understanding of our holding, we will briefly detail the nature of these entities and their relationship to each other.

The Board is the agency head within DEQ for purposes of the Underground Storage Tank Act ("USTA"), Utah Code Ann. §§ 19-6–401 to –427; Utah Admin. Code R311–210–6(a). The Division of Environmental Response and Remediation ("DERR"), also within DEQ, has a variety of responsibilities relating to compliance issues detailed in the Hazardous Substances Mitigation Act, Utah Code Ann. §§ 19–6–301 to –325, and the USTA. *See id.* § 19–1–105(1)(c). DERR is subdivided into branches, with the Underground Storage Tank Branch being responsible for investigating and prosecuting violations of the USTA.

Any party subject to a USTA enforcement action may petition the Board for a formal adjudication. Utah Code Ann. § 63–46b–3; Utah Admin. Code R311–210–4, –7. The Board may appoint a presiding officer, Utah Admin. Code R311–210–6(2), and that officer is empowered to conduct a full formal hearing. Utah Code Ann. §§ 63–46b–6 to –11.

The presiding officer makes findings of fact and conclusions of law but is not authorized to make a final, substantive decision. Utah Admin. Code R311–210–6(b), –17(a). Rather, the presiding officer's recommendations are referred to the Board, which may adopt or reject them in whole or in part, may make an independent determination based on the record, or may remand the matter for evaluation of further evidence. *Id.* R311–210–17.

In this case, a contractor performing a tank tightness test reported contamination from an underground storage tank at one of V–1 Oil's service stations. Following subsequent inspections, the agency sent compliance and reporting schedules to V–1. According to DERR, V–1 did not respond. DERR issued a notice of violation and order to comply, and V–1 requested a formal adjudicative proceeding. The Board granted this request and appointed David O. McKnight as the presiding officer.[1]

McKnight had previously been hired as a part-time staff attorney for DERR. His responsibilities in that capacity did not involve any of the investigative or prosecutorial work conducted by the Underground Storage Tank Branch. In fact, his work was confined exclusively to a separate branch within DERR. He was thus effectively "walled off" from the investigative and prosecutorial activities related to underground storage tank enforcement conducted by the agency. Nevertheless, on the basis of McKnight's status as a part-time attorney for DERR, V–1 moved for McKnight's recusal, alleging that his employment within DERR created a risk of bias in his role as an adjudicatory officer. At the hearing on the motion, the nature of McKnight's employment by DERR was explained:

> McKnight indicated that he was hired by DERR with the anticipation that he would act as a presiding officer and as a staff attorney. He stated that DERR "hired me with the understanding that I'd be a presiding officer, and then I would help the Agency on matters that would not risk me being in the loop of [underground storage

---

1. Apparently, McKnight subsequently received a general appointment to "act as presiding officer on all contested orders issued by the DERR's Executive Secretary."

tanks] and [leaking underground storage tanks]."

*V–1 Oil Co. I*, 893 P.2d at 1094 (alterations in original). He further indicated that "in his work as staff attorney he [did] 'not involve [himself] in areas that would risk [his] being exposed to investigations and anything that would lead up to an issuance of an order in underground storage tank matters.'" *Id.* McKnight concluded that V–1's objections to his multiple duties within the agency did not warrant his recusal. On review, the Board declined to disqualify McKnight, stating that "V–1 ha[d] presented no evidence or suggestion of actual bias on the part of the Presiding Officer, either through his relationship to the Board or his status as an employee of the Division."

V–1 petitioned for an extraordinary writ from the Utah Court of Appeals. The Court of Appeals stated that V–1 had alleged two grounds for McKnight's recusal: (1) actual bias or prejudice, and (2) presumed bias due to his association with DERR as a staff attorney. *V–1 Oil Co. I*, 893 P.2d at 1096. The Court first held, "Petitioner has not demonstrated actual bias or prejudice." [2] *Id.* The Court thus limited its treatment to the question of whether "McKnight should be disqualified based upon his employment as a staff attorney by DERR." *Id.* The Court concluded that McKnight's appointment violated "[b]asic considerations of fairness and impartiality in agency proceedings." *Id.*

## II. STANDARD OF REVIEW

■ A court's decision to grant or deny a petition for extraordinary relief in the nature of mandamus is discretionary with the court to which the petition is brought, and it is discretionary in the sense that it is "never a matter of right on behalf of the applicant." *Renn v. Board of Pardons*, 904 P.2d 677, 683 (Utah 1995). However, on certiorari or appeal from a grant of extraordinary relief, the legal reasoning of the court granting the writ is reviewed for correctness. *Id.* at 683–85.

**2.** V–1 conceded as much in its hearing before McKnight and does not now contest this holding

## III. BIAS AND ADMINISTRATIVE QUASI–JUDICIAL OFFICERS

■ We begin by examining the foundation of the Court of Appeals' decision. The proper starting point for any analysis of an asserted ethical conflict in an adjudicatory proceeding is by reference to the ethical rules governing that proceeding. In this case, the Utah Administrative Code and the State Officers and Employees Ethics Act provide rules that are directly applicable to administrative adjudicative officers. Chapter 16 of title 67 of the Utah Code imposes ethical constraints on all public officers and is primarily concerned with personal conflicts of interest relating to financial transactions. Neither V–1 nor the Court of Appeals has asserted that any provision of this chapter has been violated.

Rule 315 of the Utah Administrative Code—specifically pertaining to the operation of agencies charged with regulating solid and hazardous waste—speaks more directly to the circumstances of this case. It reads in pertinent part:

> A member of the Board or other Presiding Officer shall disqualify him/herself from performing the functions of the Presiding Officer regarding any matter in which:
>
> (a) He/she [or a closely related] person:
>
> . . .;
>
> (2) Has acted as an attorney in the proceeding or served as an attorney for, or otherwise represented a Party concerning the matter in controversy;
>
> . . . .
>
> (b) The Presiding Officer is subject to disqualification under principles of due process and administrative law.

Utah Admin. Code R315–12–10.

McKnight has not "acted as an attorney" in this proceeding, nor has he "represented a Party concerning the matter in controversy." He is, however, subject to disqualification if the principles of due process applicable to the particular administrative context of this case require it. Because McKnight acted in

on appeal.

an administrative adjudicatory role, ethical rules governing other administrative adjudicative proceedings are relevant to the due process and fairness requirements in this case. The Court of Appeals held that McKnight should be disqualified because bias had to be presumed under the Utah Code of Judicial Conduct, Canon 3, which states, "A judge shall enter a disqualification in a proceeding in which the judge's impartiality might reasonably be questioned." [3] Even though the Court of Appeals acknowledged that administrative decision makers are not "held to th[e] full standard of the canons," [4] it apparently construed the language in Canon 3 as a rigid principle of due process that was fully applicable in administrative proceedings. Consequently, the Court held that "McKnight's own characterization of his dual role as presiding officer and DERR staff attorney ... creates the appearance of impropriety that erodes confidence in the basic fairness of the hearing process and must be avoided in quasi-judicial proceedings as diligently as in judicial proceedings." *V–1 Oil Co. I*, 893 P.2d at 1097.

■ In our view, the Court of Appeals' analysis fails to account for relevant distinctions between administrative and judicial proceedings. The requirements of due process depend upon the specific context in which they are applied because "unlike some legal rules due process is not a technical conception with a fixed content unrelated to time, place, and circumstances." *Cafeteria Workers Union v. McElroy*, 367 U.S. 886, 895, 81 S.Ct. 1743, 1748, 6 L.Ed.2d 1230 (1961). Determining the requirements of due process in any given context involves a balancing of three factors:

> first, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and

the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the functions involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Mathews v. Eldridge*, 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976).

Administrative agencies engage in a variety of functions. Certain administrative decisions are of a policy-making nature, such as the establishment of regulations pursuant to statutory authority; others resemble judicial decision making, such as the determination of whether a party or an entity has violated a regulation. Commentators tend to categorize administrative decision making as either "legislative" or "adjudicative" in nature. John R. Allison, *Combinations of Decision–Making Functions, Ex Parte Communications, and Related Biasing Influences: A Process–Value Analysis* 1993 Utah L.Rev. 1135, 1160 [hereinafter Allison, *Process–Value Analysis* ]. Not all agency actions are easily pigeonholed as either purely legislative or purely adjudicative, however. *Id.* at 1161. Rather, they may fall anywhere along a continuum between the two forms. *Id.*

■ As a general rule, "[l]egislative decisions involve the development of policies, principles, or rules that typically apply prospectively to a large number of parties," whereas "an adjudicative decision attaches legal or other consequences to individualized past conduct." *Id.* at 1160. The requirements of due process tend to vary in proportion to the degree to which an administrative decision is adjudicative in nature as opposed to legislative. *Id.* at 1160–62. "[A]s a general proposition ... procedural due process applies to adjudicative government decisions and not to legislative ones." [5] *Id.* at 1162.

---

**3.** Canon 3E continues:

> including but not limited to instances where ... (b) the judge had served as a lawyer in the matter in controversy, *had practiced law with a lawyer who had served in the matter at the time of their association,* or the judge or such lawyer has been a material witness concerning it. (Emphasis added.)

**4.** For instance, the canons specifically prohibit judges from practicing law, *see* Code of Judicial Conduct Canon 4G, whereas the Utah Administrative Procedures Act carries no such prohibition.

**5.** Various commentators have offered a number of rationales to support this distinction. For instance, legislative decision making tends to affect large groups of people or entities in a similar

In this case, McKnight's decisions were made as presiding officer in V–1's case. Although those decisions are not final decisions, they are clearly adjudicative in nature. The hearing concerned allegations that V–1 failed to investigate reports of leaking storage tanks and to submit a corrective action plan. If proven, such failures could constitute violations of state and federal regulations and could ultimately result in sanctions.

 Commentators have noted that accusatory proceedings, due to their similarity in both form and consequence to formal criminal proceedings, require particular attention to due process concerns. Allison, *Process-Value* at 1180. Therefore, stricter due process requirements apply to adversarial, adjudicative decision making than to legislative-type decision making. The most fundamental requirement in this context is "the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Mathews,* 424 U.S. at 333, 96 S.Ct. at 902 (quoting *Armstrong v. Manzo,* 380 U.S. 545, 552, 85 S.Ct. 1187, 1191, 14 L.Ed.2d 62 (1965)). As a necessary corollary to this opportunity, affected parties must receive adequate notice, and they must also be assured that their concerns will be heard by an impartial decision maker. *Mathews,* 424 U.S. at 325 n. 4, 332–35, 96 S.Ct. at 898 n. 4, 901–03. "Scholars and judges consistently characterize provision of a neutral decisionmaker as one of

the three or four core requirements of a system of fair adjudicatory decision making." Kenneth C. Davis, Richard J. Pierce, Jr., *Administrative Law Treatise* § 9.8, at 67 (3d ed. 1994). Where a party to an adversarial proceeding can demonstrate actual impermissible bias or an unacceptable risk of an impermissible bias on the part of a decision maker, the decision maker must be disqualified.

The latter principle concerns us here. The Court of Appeals' holding was premised on the principle that McKnight's employment with DERR presented an impermissible bias in his role as an adjudicator, thereby violating the due process right of a party to a fair adjudicative proceeding.

There are many different types of bias, however. The Court of Appeals did not address the issue of which types of bias are so harmful as to necessitate disqualification in the administrative context.[6] A clear demonstration of partiality apparent on the face of the record, *see Bunnell v. Industrial Comm'n,* 740 P.2d 1331, 1333–34 (Utah 1987), or a showing of direct, pecuniary interest, *see Gibson v. Berryhill,* 411 U.S. 564, 579, 93 S.Ct. 1689, 1698, 36 L.Ed.2d 488 (1973), automatically requires disqualification of the decision maker. In *Bunnell,* the rec-

fashion, thus lessening the likelihood of "individualized oppression" and simultaneously increasing the publicity attending the decision and the likelihood that the affected groups may be able to exercise their collective power to reverse an unjust decision. Allison, *Process–Value Analysis* at 1162. It is also less feasible in a legislative context to provide notice to all affected parties and invite their participation; parties are more inclined to expect rigid adherence to due process protections in an adjudicative context than in a legislative one; and the parties to an adjudicative proceeding are more likely to be privy to, and aware of, the facts relevant to that proceeding than are parties affected by a legislative-type proceeding. *Id.* at 1163. Kenneth C. Davis & Richard J. Pierce, Jr., *Administrative Law Treatise* § 9.5, at 55 (3d ed. 1994).

6. Professors Davis and Pierce have summarized the categories of biasing influences and their consequences as follows:

(1) A prejudgment or point of view about a question of law or policy, even if so tenaciously held as to suggest a closed mind, is not, without more, a disqualification. (2) Similarly, a prejudgment about legislative facts that help answer a question of law or policy is not, without more, a disqualification. (3) Advance knowledge of adjudicative facts that are in issue is not alone a disqualification for finding those facts, but a prior commitment may be. (4) A personal bias or personal prejudice, that is an attitude toward a person, as distinguished from an attitude about an issue, is a disqualification when it is strong enough and when the bias has an unofficial source; such partiality may be either animosity or favoritism. (5) One who stands to gain or lose by a decision either way has an interest that may disqualify if the gain or loss to the decisionmaker flows fairly directly from her decision.
Davis & Pierce, *Administrative Law Treatise* § 9.8, at 68.

ord indicated that in numerous instances the administrative law judge had demonstrated active hostility toward the claimant in an employment disability benefits proceeding, while at the same time exhibiting favoritism toward the employer and the employer's counsel. 740 P.2d at 1333–34. We ruled that such an atmosphere of partiality violated fundamental principles of due process. *Id.* at 1334; *see also Local No. 3 v. NLRB,* 210 F.2d 325, 329–30 (8th Cir.1954) (disqualifying examiner who uniformly rejected evidence offered to support company's point of view, while accepting evidence supporting union). *But see NLRB v. Pittsburgh S.S. Co.,* 337 U.S. 656, 659, 69 S.Ct. 1283, 1285, 93 L.Ed. 1602 (1949) (holding "total rejection of an opposed view cannot of itself impugn the integrity or competence of a trier of fact").

■ In *Berryhill,* the United States Supreme Court disqualified a state licensing board of optometrists in Alabama, which was composed entirely of independent practitioners, from reviewing the licenses of optometrists who were employed by corporations. The licensing board had interpreted a statute to preclude the practice of optometry by corporate employees. The board commenced administrative proceedings for the purpose of revoking the licenses of corporate-employed optometrists and had also filed a civil suit against them. Because nearly half of the practicing optometrists in Alabama were employed by corporations, it was obvious that the independent optometrists on the licensing board would receive more business, thereby reaping a substantial pecuniary gain, if the corporate-employed optometrists' licenses were revoked. *Berryhill,* 411 U.S. at 578, 93 S.Ct. at 1607–98. The presence of a clear, substantial pecuniary benefit is one of

the most evident causes of either conscious or subconscious bias; and perhaps more important, it is the type of temptation that inevitably compromises public confidence in the process itself, undermining the legitimacy of any decision so tainted. Thus, the Supreme Court concluded that disqualifying bias will be presumed whenever the decision maker has a substantial pecuniary interest in the outcome.[7] *Id.* at 579–80, 93 S.Ct. at 1698–99; *see also Tumey v. Ohio,* 273 U.S. 510, 531–35, 47 S.Ct. 437, 444–45, 71 L.Ed. 749 (1927) (judge received portion of fines and fees assessed in addition to his salary); *cf. Ward v. Village of Monroeville,* 409 U.S. 57, 57–59, 61–62, 93 S.Ct. 80, 81–83, 83–84, 34 L.Ed.2d 267 (1972) (where mayor had obligation to maintain village finances, a major portion of which were derived from the fines levied by the mayor's court, mayor was disqualified from acting as judge).[8]

■ Presumed bias is not limited to cases where a personal pecuniary benefit is present. Such a presumption may also be applied in other circumstances where the risk of bias is so great as to offend principles of due process. For instance, disqualifying bias may be presumed from a prior manifested prejudice against a person or group of persons. *See Berger v. United States,* 255 U.S. 22, 41 S.Ct. 230, 65 L.Ed. 481 (1921) (judge disqualified for comments demonstrating prejudice against German–Americans). Unacceptable biasing influences may also arise from an adjudicator's preconceived attitudes on points of law or policy that are topics of dispute before an adjudicator, although such attitudes are rarely severe enough to justify disqualification. *See generally* Davis & Pierce, *Administrative Law Treatise* § 9.8, at 76–81.

---

7. This holding, however, does not create a blanket rule prohibiting *any* personal interest in the outcome of a decision. "Many members of agency boards and commissions have some degree of economic interest in the subject they regulate.... General economic interest in the subject matter is [by itself] insufficient to disqualify a decisionmaker." Davis & Pierce, *Administrative Law Treatise* § 9.8, at 73 (citing *Friedman v. Rogers,* 440 U.S. 1, 17–19, 99 S.Ct. 887, 898–99, 59 L.Ed.2d 100 (1979)).

8. This case demonstrates that a pecuniary interest need not be personal to justify disqualification, but a nonpersonal pecuniary interest must clearly taint the decision-making process before it will result in disqualification. In *Dugan v. Ohio,* 277 U.S. 61, 63–65, 48 S.Ct. 439, 439–40, 72 L.Ed. 784 (1928), the mayor was only one member of a commission that exercised legislative power and *did not participate* when the commission exercised executive power. In that case, the mayor was not disqualified from levying fines as a judge.

In this case, V–1 objects specifically to the agency practice of allowing an attorney to act as an adjudicator where other persons within the administrative division for which that attorney works have the responsibility for prosecuting the matter at which the adjudicator presides. Although McKnight is not personally involved in investigating or prosecuting any of the cases which he adjudicates, he is employed by the same administrative agency which conducts those activities. This raises a due process issue related to institutional combination of prosecutorial and adjudicative functions.

In a typical adversarial administrative proceeding, agencies perform several different functions. Generally, commentators divide those functions into three categories: investigative, advocatory (or prosecutorial), and adjudicative. Although there is little potential for bias when the investigative and advocatory functions are combined, the potential for impermissible bias when either the investigative or the advocatory function is combined with the adjudicative function is more readily apparent, *see* Allison, *Process–Value Analysis* at 1167–68, particularly as the case becomes more accusatory in nature. *Id.* at 1180. The natural suspicion is that adjudicators may be disposed to act favorably toward their employers. In a formal criminal context, for instance, it would be inappropriate for an adjudicator to be employed as a part-time prosecutor. *Cf. State v. Brown,* 853 P.2d 851, 856–57 (Utah 1992) (holding part-time prosecutor barred from acting as defense counsel).

Nevertheless, examining the question in the criminal context does not answer the question in the administrative context, where "any form of function combination . . . occurring alone, without other exacerbating biasing influences, is very unlikely to violate procedural due process." Allison, *Process Value Analysis* at 1145 (citing *Marcello v. Bonds,* 349 U.S. 302, 311, 75 S.Ct. 757, 762–63, 99 L.Ed. 1107 (1955)). In this respect, the analogy to the criminal context cannot be strictly applied. As noted by Professors Davis and Pierce:

Critics of the U.S. system of administrative justice have long used the strict separation of functions among agencies in our criminal justice system as a paradigm for criticism of the fairness of administrative adjudication conducted by typical multi-function agencies. The criticism is usually followed by a demand that the legislature assign the functions of investigation, prosecution, and adjudication to separate agencies, or that the courts hold unconstitutional any system of adjudication implemented by a multi-function agency.

Generally, both legislatures and courts have declined to accept these arguments for good reason—the analogy on which they are premised is weak at many points. First, the strict agency-based separation of functions approach we have chosen in the criminal justice context is extremely expensive and inefficient. It may be justified in that context because of the extraordinarily high value we place on avoiding the risk of erroneously incarcerating people. It by no means follows, however, that we should select the least efficient and most costly institutional structure for adjudicating disputes concerning social security benefits, personnel decisions, utility prices, environmental regulation, etc.

Davis & Pierce, *Administrative Law Treatise* § 9.9, at 92 (citations omitted); *see also* Michael Asimow, *When the Curtain Falls: Separation of Functions in the Federal Administrative Agencies,* 81 Colum. L.Rev. 759, 768 (1981) [hereinafter Asimow, *Separation of Functions* ] ("Separation of functions in administrative agencies is, of necessity, far from the pristine system characteristic of criminal-law enforcement.").

This more lenient treatment of administrative decision making is primarily an acknowledgment of the third factor in the due process analysis set forth by *Mathews v. Eldridge:* "the Government's interest, including the function involved and the fiscal and administrative burdens that . . . additional or substitute procedural requirement[s] would entail." 424 U.S. at 335, 96 S.Ct. at 903. Administrative agencies are typically burdened with numerous duties and limited funding. Moreover, to carry out their statu-

torily mandated responsibilities with any semblance of unity of purpose, they must be allowed to combine essentially all their functions under the umbrella of a single, or group of, related entities.[9] "In the context of an administrative agency or other multi-function decision-making organization ... we must permit certain combinations of functions or else dispense with these organizations altogether. We cannot have it both ways." Allison, *Process–Value Analysis* at 1171. It would be literally impossible for many administrative agencies to function if all their adjudicative activities had to be given the same due process protections as in a criminal trial in terms of a rigid scheme providing for total structural independence of the adjudicator. For example, agency decisions not to issue drivers' licenses, provide unemployment compensation benefits, etc., combine adjudicative and administrative functions in the same person. The paralysis of basic governmental functions and the overwhelming expense caused by imposition of an uncompromising judicial model of complete structured independence of the adjudicator would have disastrous consequences for many essential governmental programs and functions.

In fact, institutional combinations of functions afford certain benefits. In performing multiple functions, an agency's rule-making activities inform its adjudicative actions and vice versa. *See SEC v. Chenery Corp.*, 332 U.S. 194, 201–02, 67 S.Ct. 1575, 1579–80, 91 L.Ed. 1995 (1947). The ability of agencies to draw on specialized knowledge gained in a wide spectrum of activities, from rule-making to formal and informal adjudication, allows those agencies to develop an efficient and consistent manner of addressing and resolving the concerns and problems they are charged with administering. Policy is developed and furthered on a relatively unified front rather than through the sometimes arbitrary and conflicting paths often pursued by organizations that are subject to formal separation of legislative, adjudicative, and other functions. Further, the resulting increased efficiency and uniformity can enhance the respect an agency earns from the parties regulated by it and from the general public at large.

 This does not mean that the due process concerns arising out of combinations of functions cannot be addressed in the administrative context. Rather, it merely means that adequate separation of functions can be accomplished internally. In particular, the separation takes place at the individual rather than the institutional level. This is essentially the path that has been chosen by Congress in adopting the federal Administrative Procedures Act:

> Early in the administrative era, some observers understandably took a monolithic view of agencies as decision makers, a view necessarily leading to the conclusion that the same decision-making agent is performing all functions. This view generally did not prevail, however. From its inception in 1946, the [Federal Administrative Procedures Act] has clearly recognized the individual as the decision-making agent, at

**9.** Davis and Pierce are of the opinion that whenever Congress has sought to segregate various functions under wholly separate administrative entities, the result has been disastrous. For example, the
> trio of agencies [charged with resolving occupational safety and health disputes] have performed their mission poorly. The inefficient multi-agency structure Congress chose to implement this regime ranks high on the list of the many explanations for this poor performance. OSHA and OSHRC frequently disagree on issues of law and policy[;] consequently, they expend a considerable portion of their limited resources litigating inter-agency disputes in the federal courts.

Davis & Pierce, *Administrative Law Treatise* § 9.9, at 100; *see also* George Robert Johnson, Jr., *The Split Enforcement Model: Some Conclusions from the OSHA and MSHA Experience*, 39 Admin. L.Rev. 315 (1987). Furthermore, the legislative choice to externally separate functions often has more to do with the political environment in which the agency is constructed than with due process concerns. "If political support for the program is weak and opposition is strong, the opposition can render the program ineffective by building high costs, delay, and inefficiency into the statutorily mandated decisionmaking process." Davis & Pierce, *Administrative Law Treatise* § 9.9, at 100–01.

least at the staff level, and the statute takes the intermediate approach of limiting certain combinations among these individual functionaries.

Allison, *Process–Value Analysis* at 1172 n. 89 (citation omitted); *see also* Asimow, *Separation of Functions* at 761 ("Congress decided that internal separation of an agency's decisionmaking from its investigative and prosecutorial functions would achieve impartiality without incurring the costs of complete separation.").[10]

In the context of administrative agencies, internal separation of functions allows agencies the flexibility to perform the multitude of duties assigned to them while at the same time adequately protecting due process interests. On this question, Professor Allison observes:

> Despite the psychological effects of participating in an organization, the individual is still intellectually, emotionally, and morally autonomous to a meaningful degree. Moreover, to view the decision-making unit as the organization necessarily leads to the conclusion that the same entity investigates, advocates, and judges. If one is the least bit sensitive to process values, the organization-as-decision maker premise necessarily causes one to condemn the procedure as the worst kind of prejudgment. This view is not only unrealistic in a modern world demanding complex government, but also is unnecessary. Process concerns may be addressed by viewing the individual, or perhaps the small group (such as an advocatory staff), as the decision-making entity and then proceeding to optimize process values from that premise.

Allison, *Process–Value Analysis* at 1171–72 (footnote omitted).

Echoing this sentiment, Professors Davis and Pierce comment:

> Separation of functions can be implemented at the level of individuals rather than at

the agency level. To the extent that combining functions creates a conflict of interest, that conflict is largely a function of psychology and human emotions. No one would want the district attorney who prosecutes him to decide whether he is guilty, because district attorneys prefer to "win" rather than to "lose" cases. It is difficult for anyone who has worked long and hard to prove a proposition, e.g., the defendant is guilty, to make the kind of dramatic change in psychological perspective necessary to assess that proposition objectively, e.g., to decide whether the defendant is guilty. That potentially powerful psychological conflict of interest is internal to an individual, however. The potential for conflicts of interest to infect adjudicatory decisionmaking diminishes greatly if functions are separated at the individual level, i.e., an individual cannot both prosecute a case and decide the case. Separating functions within an agency is likely to cause the individuals in the agency to identify more by function than by agency, e.g., "I am an agency prosecutor, or I am an agency adjudicatory decisionmaker."

Davis & Pierce, *Administrative Law Treatise* § 9.9, at 93–94.

Similarly, in *Vali Convalescent & Care Institution v. Industrial Commission*, 649 P.2d 33, 37 (Utah 1982), we endorsed the practice of internal separation of functions as a means of balancing due process concerns within the administrative agency context: "In administrative proceedings, the practice of an agency acting as prosecutor and judge is not unconstitutional, at least if those functions, with respect to discretionary matters, are kept separate within the agency. '[M]any agencies have functioned for years, with the approval of the courts, which combine these roles.'" *Id.* (quoting *Brinkley v. Hassig*, 83 F.2d 351, 357 (10th Cir.1936)). Thus, at least

10. In this regard, it is worth mentioning that statutory provisions such as the APA are typically more stringent than constitutional requirements. As Davis and Pierce note:

> The Supreme Court's constitutional floor is well below the APA approach to separation of functions. Indeed, the Court has never held an adjudicatory regime unconstitutional on the

basis that the functions were insufficiently separated. As a result, Congress has considerable discretion to depart from the APA in either direction [i.e., to require more stringent or less stringent separation of functions within a given agency scheme].

Davis & Pierce, *Administrative Law Treatise* § 9.9, at 98.

at the lower levels of an agency's hierarchy,[11] internal or individual separation of functions adequately addresses most due process concerns that arise.

Within some agencies, separation of functions is achieved by creating essentially a separate adjudicatory department within the agency. These departments are typically composed of administrative law judges who enjoy a degree of autonomy within the agency somewhat comparable to that enjoyed by judges within the regular judicial branch of a traditional tripartite governmental system. The Court of Appeals' opinion appears to treat such a system as the minimum due process requirement for all administrative adjudication.[12] *V–1 Oil Co. I*, 893 P.2d at 1097 n. 3. However, such inflexibility fails to account for legitimate efficiency concerns which various administrative agencies confront and does not balance those concerns against the purported harm resulting from a failure to structure an agency in a manner designed to segregate adjudicatory employees completely from all other responsibilities.

The record reflects that McKnight was hired to function as both an adjudicative officer and a staff attorney because "there may not be a heavy enough case load for a full time presiding officer." Evidently, the purpose behind assigning him multiple functions within the agency was an effort to maximize limited resources. Although we do not have a sufficient record before us to make an independent judgment of the level of efficiency so achieved, the administrative officials who must actually run and staff their organizations are in a far better position to do so than is an appellate court which is largely unfamiliar with the agency's day-to-day operations.

This is not to say that we are not concerned with, or that due process does not demand, serious attention to procedures designed to eliminate bias in accusatory administrative adjudications. Instead, the various procedures designed to address due process concerns must be weighed, along with their costs, against the purported benefits and detriments that their implementation would engender.

In this case, there was no strict segregation of all personnel with adjudicatory responsibilities from all other duties within the division. DERR required McKnight to participate in certain staff attorney functions but took care to ensure that all his staff attorney

---

11. Numerous cases have made clear that full separation of functions is not required at the highest level of an agency. "[A]gencies perform many interrelated functions and are organizationally complex; it is thus impossible and highly undesirable to insulate adversaries and decisionmakers, particularly agency heads, from one another for all purposes." Asimow, *Separation of Functions* at 765. Under the Federal APA, separation of functions is not required

at the highest level of the agency, i.e., the cabinet officer, administrator, or collegial body that has overall responsibility for the agency. The APA permits the agency head to decide, for instance, whether to investigate a case, how much of the agency's resources to devote to an investigation, whether to prosecute a case, and how much of the agency's resources to devote to prosecution of a case. Agency heads also decide cases. APA [5 U.S.C.] § 557(b) provides: "On appeal from or review of the initial decision, the agency has all the power which it would have in making the initial decision except as it may limit the issues on notice or by rule." The effect of this provision is to allow agencies to treat ALJ initial decisions as recommendations, with all ultimate decisionmaking power held by the agency head. *Most agencies operate in this man-*

*ner.* The agency adopts an ALJ's decision only if, and to the extent that, it agrees with the decision.

Davis & Pierce, *Administrative Law Treatise,* § 9.9, at 97. A substantially similar process governs the manner in which DERR and the Board conduct hearings in underground storage tank matters.

12. The Court of Appeals' holding on this matter is not entirely clear. On petition for an extraordinary writ, it simply held that McKnight must recuse himself. In dicta, however, the Court opined that the present system (which allows agencies with investigatory and advocatory duties to employ ALJs or other adjudicatory officers) is problematic. According to the Court of Appeals, those problems are "alleviated somewhat when administrative law judges have exclusively adjudicative functions and do not also undertake work as legal counsel for their employing agency." *V–1 Oil Co. I*, 893 P.2d at 1097 n. 3. But the clear implication was that the Court of Appeals believed that even that degree of separation would be inadequate. The Court then proceeded to endorse a central panel system of ALJs which would presumably provide thoroughly independent and neutral ALJs to all, or a large group of, administrative agencies. *Id.*

duties related to activities outside the branch of the division responsible for investigating and prosecuting underground storage tank violations. In this regard, the Board determined that McKnight's

> position was implemented in a manner to insure that any staff attorney functions [he] performed would be completely independent of matters that could result in UST [underground storage tank] adjudications. Accordingly, [he] has functioned as a staff attorney on matters such as procurement issues, drafting and reviewing legal documents such as CERCLA cooperative agreements and consent orders, drafting UST administrative adjudicative procedures, and working on standard forms for cost recovery. [He] is kept completely detached from any DERR matters that could result in an UST order on owner/operators of USTs.

V–1 argues that this degree of separation is insufficient, asserting that McKnight

> is paid by the Agency to represent their interests. By assuming the role as the Agency's attorney, Mr. McKnight assumed certain fiduciary duties towards the Agency and his conduct towards his client or employer is governed by strict rules of professional responsibility. Among those duties is the requirement that Mr. McKnight maintain a high degree of loyalty towards the Agency.

This argument misconstrues the nature of McKnight's duties. In fact, the converse is true. His duty of loyalty toward his employer requires him to function as an impartial adjudicator. According to the record, McKnight has no duty of partiality toward the Underground Storage Tank Branch of DERR—from which his activities as an attor-

ney have been specifically segregated; whereas, when the merits of a case require McKnight to make findings and recommendations that are unfavorable to the Underground Storage Tank Branch's position, his failure to do so would constitute a serious breach of loyalty.

If McKnight had actually served as an investigator or advocate in this particular case, V–1's argument would very likely have merit. Where individuals have previously taken on an adversarial role with regard to a particular case, they tend to become psychologically committed to a particular view of contested issues. One commentator has described this as "the will to win."[13] *See* Asimow, *Separation of Functions* at 770, 788. Where, on the other hand, an individual has not undertaken such a commitment, the risk of a similar bias is minimal. *Id.* at 770. V–1 nevertheless asserts that McKnight's status as a lawyer, as opposed to agency employees who are not lawyers, imposes on him a duty, born of the attorney-client relationship between him and his employer, to act in favor of all the branches and divisions of his employing agency. We find no merit in this argument.[14] We do not accept the proposition that the employing agency is a client or that McKnight owes the same duty of loyalty to that agency that he would owe to a client.

We therefore hold that DERR accomplished an appropriate and sufficient separation of functions at the individual level by segregating McKnight from contact with the investigative and prosecutorial arm of DERR. In this case, a workable scheme is created within the agency to prevent McKnight from engaging in multiple functions likely to bias his work as an adjudicator. Due process is not violated by allowing

---

13. In the criminal context, for instance, prosecutors are likely to be biased because they have a personal and professional stake in a particular result, a will to win. If a prosecutor thought that a charge lacked probable cause or that a miscarriage of justice was likely, professional duty would require abandonment of the prosecution. Having committed himself intellectually and psychologically, as well as having committed institutional resources to the prosecution, a prosecutor may perceive the issues through a lens that distorts his perceptions in the state's favor.

Asimow, *Separation of Functions* at 788–89.

14. Arguably, McKnight's status as an attorney is actually *less* likely to engender concerns about bias. At least one commentator has asserted, "Attorneys and others whose training, experience, and job description require them to present and support positions in a decision-making process undoubtedly may develop a facility for performing the task zealously while remaining personally detached." Allison, *Process–Value Analysis* at 1179.

McKnight to adjudicate V–1's hearing. We accordingly reverse the Court of Appeals' decision.

ZIMMERMAN, C.J., and HOWE, DURHAM, and RUSSON, JJ., concur in Associate Chief Justice STEWART'S opinion.