IN THE UTAH COURT OF APPEALS

----ooOoo----

| | | |
|---|---|---|
| D. Craig Carlsen, | ) | MEMORANDUM DECISION |
| | ) | |
| Petitioner and Appellant, | ) | Case No. 20110142-CA |
| | ) | |
| v. | ) | |
| | ) | F I L E D |
| Board of Adjustment of the City of | ) | (September 20, 2012) |
| Smithfield, a municipal corporation, | ) | |
| | ) | 2012 UT App 260 |
| Respondent and Appellee. | ) | |
| _____ | ) | |
| | ) | |
| Dale Smith and Margaret Smith, | ) | |
| | ) | |
| Intervenors and Appellees. | ) | |

-----

First District, Logan Department, 090103233
The Honorable Thomas Willmore

Attorneys:    D. Craig Carlsen, Smithfield, Appellant Pro Se
              Bruce L. Jorgensen, Logan, for Appellee Board of Adjustment of the
              City of Smithfield, a municipal corporation
              Shawn P. Bailey and Shaun L. Peck, Logan, for Appellees Dale Smith
              and Margaret Smith

-----

Before Judges Voros, Roth, and Christiansen.

ROTH, Judge:

¶1      Petitioner D. Craig Carlsen challenges a decision by the Board of Adjustment (the
Board) for Smithfield City (the City), recognizing an existing, nonconforming animal

rights use on property (the Property) owned by Carlsen's neighbors, Dale and Margaret Smith. We decline to disturb the Board's decision.

¶2      In 2009, the Smiths petitioned the Board to recognize an existing nonconforming animal rights use on the Property. *See* Smithfield City Code § 17.16.010 (providing that "nonconforming uses" are "uses of land or structures, which although legal at the time of their establishment do not now conform to the use regulations of the district within which they are situated"). The Property, which had originally been zoned as agricultural, was rezoned as residential in 1970. In support of their petition, the Smiths asserted that cattle continued to be kept on the Property after the rezoning. According to the Smiths, this constituted an existing nonconforming animal rights use that had not been abandoned over the years because cattle have been kept on the Property for at least thirty days per calendar year since 1970. *See generally id.* § 17.16.060 ("To maintain a nonconforming [animal rights] land use, animals and/or fowls must accompany lots and/or buildings for a period of not less than thirty (30) days per calendar year."); *id.* § 17.16.040(B) ("A [nonconforming] use shall be deemed to have ceased when it has been discontinued either temporarily or permanently for a period of one year or more, whether or not with the intent to abandon said use. If said nonconforming use is discontinued for a continuous period of one year or more, the use shall be considered to be abandoned and any future use of such land shall conform to the provisions of the zone in which it is located."). Carlsen contested the petition.[1]

---

[1]The property at issue here has changed ownership several times since 1970 and, in the course of those transfers, has been joined to and severed from adjacent parcels of property. Because the Board's decision on this issue involved considerable discussion of and some initial confusion regarding the identity of the property at issue, it is useful to summarize its history. On the earliest plat map available in the record, the subject property was labeled parcel 0015, and it had apparently been subdivided from another property, parcel 0012. Both parcels were owned by the Erickson family. In 1986, the Erickson family transferred parcel 0015 to George and Alice Jeppesen, who joined parcel 0015 with an adjacent parcel already owned by them, parcel 0018. These combined parcels were thereafter jointly designated as parcel 0018. In 2005, the Jeppesens transferred this property into a trust. In 2009, the trust transferred the portion of parcel 0018 that had once been parcel 0015 to Dale and Margaret Smith. The Smiths already owned another property, parcel 0019, that shared boundaries with both

(continued...)

¶3     After receiving evidence presented by the Smiths and by Carlsen, the Board concluded that the Smiths had established an existing nonconforming animal rights use on the Property that had not been abandoned. Accordingly, the Board recognized a nonconforming animal rights use to keep two head of cattle on the Property. Carlsen petitioned for judicial review in the district court, and the court upheld the Board's decision. Carlsen now seeks review from this court. *See generally Patterson v. Utah Cnty. Bd. of Adjustment*, 893 P.2d 602, 603 (Utah Ct. App. 1995) (explaining that when considering a petition for judicial review of an administrative decision that was previously considered by the district court, "we review the Board's decision as if the appeal had come directly from the agency" when "the district court's review of the Board's decision was limited to a review of the Board's record"). Carlsen raises several arguments in challenging the Board's decision to recognize a nonconforming animal rights use on the Property. He also argues that a member of the Board should have

---

[1](...continued)
parcels 0018 and 0015. With this transfer, the subject property presumably became part of parcel 0019.

In addressing the Smiths' application for recognition of an existing nonconforming animal rights use, the Board was explicit that it was considering the existence of a nonconforming animal rights use on parcel 0018. However, based on the information in the record, it seems that the Board was more specifically considering the existence of a nonconforming animal rights use on the portion of parcel 0018 that had once been parcel 0015 before its subsequent transfers. The Board appears to have referred to this portion of the property as parcel 0018 simply because it had been joined with and had become part of parcel 0018 and was labeled as part of parcel 0018 on the then most current county plat map. In this regard, we note that the hearing before the Board was held on November 4, 2009, and the transfer of the property from the Jeppesens to the Smiths was recorded on October 20, 2009, so it seems unlikely that the transfer of this property--and its resulting severance from parcel 0018 and joinder with parcel 0019--would have been reflected on the plat map available to the Board at the time.

Accordingly, our reference to "the Property" generally refers to parcel 0018 so as to be consistent with the way the subject property was referred to at the hearing before the Board. But this designation more specifically refers to the portion of parcel 0018 that was once parcel 0015--the same parcel that was transferred from the Erickson family to the Jeppesens, to the Smiths--as that is the Property that is the focus of this dispute.

been disqualified for bias and that the district court erred in granting the Smiths' motion to intervene in the district court proceeding.

## I. Recognition of a Nonconforming Animal Rights Use on the Property

¶4     Carlsen challenges the Board's decision to recognize a nonconforming animal rights use on the Property. In reviewing a municipality's land use decision, "[t]he courts shall . . . presume that a decision . . . is valid" and shall "determine only whether or not the decision . . . is arbitrary, capricious, or illegal." Utah Code Ann. § 10-9a-801(3)(a) (2009). Determination of whether such a decision "is illegal depends on a proper interpretation and application of the law." *Patterson*, 893 P.2d at 604. Further, "[w]hen a land use decision is made as an exercise of administrative or quasi-judicial powers, . . . such decisions are not arbitrary and capricious if they are supported by 'substantial evidence.'" *Bradley v. Payson City Corp.*, 2003 UT 16, ¶¶ 10, 13, 15, 70 P.3d 47 (citation omitted); *accord* Utah Code Ann. § 10-9a-801(3)(c). "Substantial evidence" is "that quantum and quality of relevant evidence that is adequate to convince a reasonable mind to support a conclusion." *Bradley*, 2003 UT 16, ¶ 15 (internal quotation marks omitted).

¶5     In determining whether there is substantial evidence to support the Board's decision, "our review . . . is limited to the record provided by the [B]oard," and "we will consider all the evidence in the record, both favorable and contrary to the Board's decision." *Patterson*, 893 P.2d at 604 (internal quotation marks omitted). However, "[i]t is not our prerogative to weigh the evidence anew." *Id.* Rather, "[w]e must simply determine, in light of the evidence before the Board, whether a reasonable mind could reach the same conclusion as the Board." *Id.* Given the nature of our review of the Board's decision, "[i]t is incumbent upon the party challenging the Board's . . . decision to marshal all of the evidence in support thereof and show that despite the supporting facts, and in light of conflicting or contradictory evidence, the . . . decision [is] not supported by substantial evidence." *Id.* at 604 n.7 (citing *First Nat'l Bank of Boston v. County Bd. of Equalization,* 799 P.2d 1163, 1165 (Utah 1990); *Heinecke v. Department of Commerce Div. of Occupations & Prof'l Licensing*, 810 P.2d 459, 464 (Utah Ct. App. 1991); *Grace Drilling Co. v. Board of Review of Indus. Comm'n*, 776 P.2d 63, 68 (Utah Ct. App. 1989)).

## A. Marshaling the Evidence

¶6 In challenging the Board's decision, Carlsen's primary contention is that there is insufficient evidence to support either the Board's decision to recognize a nonconforming animal rights use on the Property or its determination that the nonconforming use had not been abandoned. In making these arguments, however, Carlsen has often failed to meet his burden of marshaling the evidence that supports the Board's decision.

¶7 In challenging the Board's decision to recognize a nonconforming animal rights use on the Property, Carlsen identifies a number of facts that he argues are inconsistent with the Board's decision. Carlsen's arguments, however, are based on selected facts that support his position and simply ignore contradictory facts that support the Board's decision.[2] Essentially, Carlsen has "emphasiz[ed] the evidence that support[s] his position, and [has] left it to the court to sort out what evidence actually support[s] the" Board's conclusion. *See Heinecke*, 810 P.2d at 464. Carlsen has, thus, "failed to completely satisfy his obligation to marshal the evidence by persistently arguing [his] own position without regard for the evidence" the supports the Board's decision. *See id.* (alteration in original) (internal quotation marks omitted). By failing to address the evidence that supports the Board's decision, Carlsen has failed to marshal the evidence; by not marshaling the evidence, Carlsen has failed to bear his burden to show that the Board's decision is not supported by substantial evidence. *See Patterson*, 893 P.2d at 604

---

[2]For example, Carlsen asserts that the Jeppesens, the predecessor owners of the Property, admitted to not keeping any cattle on the Property for over a year while George Jeppesen was ill and hospitalized. Carlsen thus argues that the Jeppesens abandoned the nonconforming animal rights use. However, Carlsen fails to acknowledge the Smiths' testimony that they, as the Jeppesens' neighbors, continued to maintain cattle on the Property for the Jeppesens while they were unable to do so themselves. Carlsen also asserts that the Smiths "convert[ed] substantial portions of [the Property] to conforming uses," which he argues left the Smiths with insufficient land to graze any cattle and sustain the nonconforming animal rights use. However, in making this argument, Carlsen ignores evidence that the cattle were regularly moved onto adjacent properties to graze and "keep the weeds down and the grass down," so even if there was insufficient land to graze cattle on the Property, grazing was done elsewhere.

n.7 ("It is incumbent upon the party challenging the Board's . . . decision to marshal all of the evidence in support thereof and show that despite the supporting facts, and in light of conflicting or contradictory evidence, the . . . decision [is] not supported by substantial evidence.").

¶8     Nonetheless, the record contains sufficient evidence to support the Board's decision. The Board had before it a number of letters written by long-term residents, many of whom had lived in the area since before 1970. In addition, the Smiths and some of these residents appeared at the hearing before the Board. This evidence collectively indicated that there had been cattle on the Property since before 1970.[3] Contradictory evidence came primarily from Carlsen himself. In deciding to recognize the nonconforming use, it is apparent that the Board gave more weight to the letters and testimonies of the Smiths and other residents than it gave to Carlsen and that the Board also resolved evidentiary inconsistencies and ambiguities in favor of the Smiths. *See Patterson v. Utah Cnty. Bd. of Adjustment*, 893 P.2d 602, 604 (Utah Ct. App. 1995) ("It is not our prerogative to weigh the evidence anew."); *Grace Drilling Co.*, 776 P.2d at 68 ("In undertaking . . . a review [of the Board's decision], this court will not substitute its judgment as between two reasonably conflicting views . . . [because i]t is the province of the Board, not appellate courts, to resolve conflicting evidence . . . ." (citations omitted)). Accordingly, our review of the record shows that "in light of the evidence before the Board, . . . a reasonable mind could reach the same conclusion as the Board," i.e., to recognize an existing nonconforming animal rights use on the Property. *See Patterson*, 893 P.2d at 604.

B.  Preservation

¶9     Carlsen also raises issues and arguments that he did not present to the Board and therefore failed to preserve. "[I]ssues not raised before administrative agencies are [not preserved and are] not subject to judicial review." *Frito-Lay v. Utah Labor Comm'n*, 2009 UT 71, ¶ 32, 222 P.3d 55; *see also ABCO Enters. v. Utah State Tax Comm'n*, 2009 UT 36, ¶ 11, 211 P.3d 382 (explaining that "the preservation rule applies when the issue raised

---

[3]Specifically, in addition to several other residents, the Smiths, the Jeppesens, and a member of the Erickson family submitted letters asserting that cattle had been kept on the Property since at least 1970. At the hearing before the Board, the Smiths and the Jeppesens testified to the same effect.

on appeal could have been resolved in the administrative setting" so as to avoid "procedural confusion and piecemeal litigation" (internal quotation marks omitted)).

¶10    First, Carlsen argues on appeal that even if the Smiths established a right to keep cattle on the Property, they failed to produce any evidence to establish a corresponding right to keep cattle *in a structure* on the Property. According to Carlsen, there is a shed on the Property that the Smiths have used in recent years to milk cows. He contends that the Smiths were required to prove the existence of a nonconforming animal rights use specifically related to the shed, i.e., that the shed had existed on the Property and had been used to milk cows since 1970. Before the Board, however, Carlsen's argument appears to have been more in the nature of a nuisance claim concerning the negative impact he suffered from the noise and smell associated with the Smiths' milking cows in a structure located close to his property line, within 100 feet of his home.[4] He did not present to the Board the more complex legal argument he has made to this court involving nonconforming uses of buildings or structures as legally distinct from the nonconforming use of the land.[5]

¶11    In addition, Carlsen asserts that the Smiths "convert[ed] substantial portions of [the Property] to conforming uses" and now argues that the Smiths thereby "transformed" the primary use of the Property into conforming uses and abandoned the nonconforming animal rights use. Although Carlsen asserted to the Board that the Smiths had used portions of the Property for nonconforming uses, he argued that these

---

[4]In particular, Carlsen relied on an ordinance that prohibits buildings or structures that house animals from being located within 100 feet of a dwelling. *See generally* Smithfield City Code § 17.48.060(C). That ordinance, however, only applies to property zoned as agricultural, and the Smiths' property is zoned as residential. Carlsen does not address whether the ordinance is applicable under the circumstances but simply assumes that it is, an assumption we do not view as self-evidently valid.

[5]Notably, the applicable ordinance of the Smithfield City Code that governs nonconforming animal rights usage does not appear to recognize a significant distinction between such a nonconforming use of land or structure as it provides, "To maintain a nonconforming land use, animals . . . *must accompany lots and/or buildings* for a period of not less than thirty (30) days per calendar year." Smithfield City Code § 17.16.060(B) (emphasis added).

other uses left insufficient land to graze cattle, *see supra* ¶ 7 n.2, not that the Smiths had essentially crowded out or abandoned their nonconforming animal rights use.

¶12    In the end, the central question presented to the Board for decision was whether the Smiths had established a nonconforming animal rights use on the Property, i.e., whether at least two head of cattle had been kept on the Property for at least thirty days each year since 1970. Although Carlsen now argues that the Board should have addressed these particular legal issues in reaching its decision, Carlsen simply failed to bring these arguments to the Board's attention. As a result, these issues are not preserved, and we will not address them further.

C.  The Erickson Property

¶13    Carlsen argues that in recognizing a nonconforming animal rights use on the Property, the Board failed to distinguish between the Property and another adjacent parcel of property. The Property, now owned by the Smiths, was previously owned by George and Alice Jeppesen as well as the Erickson family. *See supra* ¶ 2 n.1. To establish an existing nonconforming use, the Smiths had to show that there had been cattle on the Property for at least thirty days each year since 1970, when the Property was rezoned from agricultural to residential. Given the time span, the Smiths were required to show that their predecessors in interest kept cattle on the Property in order to establish the nonconforming use. Accordingly, the Smiths relied on evidence from the predecessor owners as well as other neighbors, many of whom had lived in the area since before 1970. A number of people submitted letters on the Smiths' behalf, asserting that cattle had been kept on the Property since at least 1970. Several of the letters were written by long-term residents who had lived in the area since the Property was owned by the Erickson family. Some of these letters referred to cattle kept on "the Erickson property." The references to "the Erickson property" created the potential for confusion because, even though the Erickson family had owned the Property itself during the time in question, the Erickson family also owned a parcel of land adjacent to the Property, parcel 0012, *see supra* ¶ 2, n.1.

¶14    Based on these references to "the Erickson property," Carlsen argues that the Board wrongly relied on the presence of cattle on parcel 0012 to establish a nonconforming animal rights use on the Property itself. Indeed, early in the hearing before the Board, some confusion did arise due to an initial failure to distinguish between the Property and parcel 0012. However, the fact that the Property had been

transferred from the Erickson family to the Jeppesens then to the Smiths was explained to the Board, and the distinction between the Property and parcel 0012 was also explained. The Board ultimately made it clear that it understood which property was the subject of the Smiths' request to recognize a nonconforming animal rights use. Further, based on information presented at the hearing, it is also apparent that the references to "the Erickson property" in some of the letters were made by people who were long-term residents and had lived in the area since the time when the Property was owned by the Erickson family and simply remembered the Property as "the Erickson property." Further, these letters were clearly written for the purpose of aiding the Smiths in establishing the existence of a nonconforming animal rights use on their property.

¶15    Ultimately, Carlsen has not persuaded us that the Board's decision was the erroneous result of confusion about which property was the subject of the Smiths' petition. Rather, the confusion concerning the Property, its history of ownership, and its distinction from parcel 0012 was addressed and resolved by the Board; given the evidence available in the record and the Board's careful attention to resolving this confusion, we conclude that the Board's decision in this regard was based on substantial evidence, and we therefore have no basis to disturb it. *See Grace Drilling Co. v. Board of Review of Indus. Comm'n*, 776 P.2d 63, 68 (Utah Ct. App. 1989) ("In undertaking . . . a review [of the Board's decision], this court will not substitute its judgment as between two reasonably conflicting views . . . [because i]t is the province of the Board, not appellate courts, to resolve conflicting evidence . . . ." (citations omitted)); *see also Patterson v. Utah Cnty. Bd. of Adjustment*, 893 P.2d 602, 604 (Utah Ct. App. 1995) ("We must simply determine, in light of the evidence before the Board, whether a reasonable mind could reach the same conclusion as the Board.").

D.  Number of Cattle

¶16    Carlsen next challenges the Board's decision to recognize a nonconforming animal rights use for two head of cattle. First, Carlsen argues that there was insufficient evidence to prove that two head of cattle have been kept on the Property. Carlsen points out that the letters upon which the Smiths relied to establish the nonconforming use did not state how many head of cattle were kept on the Property. The Smiths originally requested that the Board recognize a nonconforming animal rights use to keep three head of cattle on the Property. However, at the hearing the Smiths clarified that during the most recent year, they had kept only two head of cattle. As a result, the

Board only recognized the existence of a nonconforming animal rights use to keep two head of cattle on the Property. The Board's decision is consistent with the letters and testimony, which generally indicated that there were multiple animals kept on the Property by using the plural "cattle" or "cows." We do not think that the omission of a specific number of cattle in the letters undermines the Board's decision because it decided that the nonconforming animal rights use was for the minimum number cattle that could constitute a plural, i.e., two. In other words, based on the evidence, the Board could reasonably conclude that at least two head of cattle had been kept on the Property since 1970. *See Patterson*, 893 P.2d at 604 ("We must simply determine, in light of the evidence before the Board, whether a reasonable mind could reach the same conclusion as the Board.").

¶17    Second, Carlsen argues that the Board recognized a nonconforming animal rights use on the Property for too many head of cattle because it "improperly counted a calf . . . as one head of [the] two head of cattle." In support of this argument, Carlsen relies on the Smithfield City Code, which provides, "Where animal rights are properly established . . . [n]umbers may not be increased except offspring in which case the offspring may stay at the mother's side, until six . . . months of age," Smithfield City Code § 17.16.060(A). According to Carlsen, this language prohibits including offspring in counting the number of animals that are permitted on property under the animal rights nonconforming use. Carlsen thus argues that because during one year the Smiths only had one cow and its calf on the Property, they abandoned their right to have a second animal on the property. However, the Code creates an exception so that young animals can stay with their mothers until reaching six months of age without violating the prohibition that "[n]umbers may not be increased." Simply because offspring may be exempted from the count does not mean that they may not also be included in the count to maintain numbers. And we cannot say that the Board's interpretation and application of this ordinance is contrary to its plain meaning. *See generally Patterson*, 893 P.2d at 604 ("[W]hether or not the Board's decision is illegal depends on a proper interpretation and application of the law.").

¶18    Finally, Carlsen asserts that before the Smiths kept milk cows on the Property, the Jeppesens and the Erickson family had kept steers. Carlsen implicitly argues that the Smiths cannot substitute milk cows for steers under the nonconforming animal rights use. However, the Smithfield City Code provides that "[w]here animal rights are properly established . . . species follow species, i.e., cattle must follow cattle." Smithfield City Code § 17.16.060(A). Although farm operations involving steers and

milk cows are different, both are members of the same bovine species. *See, e.g., Webster's Third New International Dictionary*, 525, 354 (1993) (defining "cow" as "a domestic bovine animal regardless of its sex or age" and "cattle" as "bovine animals (as cows, bulls, steers)" or "domesticated . . . animals of the genus *Bos*"). Thus, the plain language of the nonconforming animal rights ordinance expressly rejects the distinction argued by Carlsen.

¶19     In the end, we decline to disturb the Board's decision to recognize the existence of a nonconforming animal rights use to keep two head of cattle on the Property. As we have discussed, many of the arguments raised by Carlsen fail due to his failure to marshal the evidence or preserve specific issues by raising them before the Board. As to his remaining contentions, we conclude that the Board's decision is not inconsistent with governing law and is supported by substantial evidence. Carlsen has therefore failed to carry his burden to demonstrate that the decision is arbitrary, capricious, or illegal.

## II. Bias

¶20     Carlsen argues that a member of the Board should have been disqualified because he was not an impartial decision maker. *See Dairy Prod. Servs., Inc. v. City of Wellsville*, 2000 UT 81, ¶¶ 49, 52, 13 P.3d 581 (explaining that to satisfy due process requirements in an administrative proceeding, "the concerns of the affected parties should be heard by an impartial decision maker," and thus if an "actual impermissible bias or an unacceptable risk of an impermissible bias on the part of a decision maker [can be identified], the decision maker must be disqualified" (citing *V-1 Oil Co. v. Department of Envtl. Quality*, 939 P.2d 1192, 1197 (Utah 1997)). In raising this argument, Carlsen points to a statement made by the board member at the hearing, explaining that he was inclined to believe testimony given by George Jeppesen, which contradicted aspects of Carlsen's testimony, because he had "known George a lot of years and . . . [had] found him to be a very honest person in work and outside of work, and in business and outside of business" and he has "never known [George] to lie." Based on these statements, Carlsen argues that the board member admitted to having a "bias and prejudice[]" because "he had personal and business dealings with George Jeppesen for numerous years."

¶21     Carlsen, however, did not preserve this issue by raising it to the Board. *See Frito-Lay v. Utah Labor Comm'n*, 2009 UT 71, ¶ 32, 222 P.3d 55 ("[I]ssues not raised before

administrative agencies are [not preserved and are] not subject to judicial review."); *ABCO Enters. v. Utah State Tax Comm'n*, 2009 UT 36, ¶ 11, 211 P.3d 382 (explaining that "the preservation rule applies when the issue raised on appeal could have been resolved in the administrative setting"). By failing to raise this issue to the Board either during or shortly after the hearing, the statements made by the board member were never explored to determine the nature or extent of the relationship between the board member and George Jeppesen. Indeed, in the absence of additional specific information, the conclusion Carlsen has drawn about the board member's impartiality due to his relationship with George Jeppesen is only a possible inference, not fully supported by the board member's statements. These statements alone, without the benefit of the Board's review, do not show that the board member had a pecuniary interest in or that he stood to gain or lose from his decision in this matter due to some sort of relationship, business or otherwise, with Jeppesen; further, based on these statements, there is no obvious or direct link between the board member's relationship with Jeppesen and any pecuniary interest in a decision regarding the existence of a nonconforming animal rights use on the Property. *See generally V-1 Oil Co.*, 939 P.2d at 1197 ("A clear demonstration of partiality apparent on the face of the record, or a showing of direct, pecuniary interest, automatically requires disqualification of the decision maker." (citations omitted)); *Dairy Prod. Servs., Inc.*, 2000 UT 81, ¶ 52 (explaining that a decisionmaker is subject to disqualification if he or she has "[a] personal bias or personal prejudice, that is an attitude toward a person, . . . when it is strong enough" or if he or she "stands to gain or lose by a decision either way . . . if the gain or loss to the decisionmaker flows fairly directly from [his or] her decision" (internal quotation marks omitted)). Thus, on the face of the record, the board member's statements do not appear to be a clear demonstration of partiality or the sort of attitude toward a person that is strong enough to establish a disqualifying bias. *See, e.g., Bunnell v. Industrial Comm'n*, 740 P.2d 1331, 1333-34 (Utah 1987) (concluding that the decision maker was biased due to a clear demonstration of partiality apparent on the face of the record, and detailing numerous ways in which the administrative law judge at issue conducted an administrative hearing in an "unacceptable" manner), *discussed in V-1 Oil Co.*, 939 P.2d at 1197-98. Because this issue could have and should have been initially resolved by the Board itself, Carlsen failed to preserve the issue for our review.

¶22 In addition, this issue is inadequately briefed. *See generally* Utah R. App. P. 24(a)(9) ("The argument shall contain the contentions and reasons of the appellant with respect to the issues presented . . . with citations to the authorities . . . relied on."); *West Jordan City v. Goodman*, 2006 UT 27, ¶ 29, 135 P.3d 874 ("An adequately briefed

argument must provide meaningful legal analysis. A brief must go beyond providing conclusory statements and fully identify, analyze, and cite its legal arguments. This analysis requires not just bald citation to authority but development of that authority and reasoned analysis based on that authority." (internal quotation marks omitted)). In raising this issue, Carlsen asserts that "any judge in the trial courts . . . would be required to disqualify themselves under identical circumstances." However, in so arguing, Carlsen has not demonstrated that the recusal requirements for judges are the same as the standards that govern disqualification for bias of a decision-maker in an administrative proceeding heard before a citizen-staffed board. More importantly, Carlsen has failed to engage in any analysis under the standard that is applied to determine if a decision-maker in an administrative proceeding must be disqualified for bias. *See Dairy Prod. Servs., Inc.*, 2000 UT 81, ¶ 52; *V-1 Oil Co.*, 939 P.2d at 1197.

¶23 Because this issue is neither preserved nor adequately briefed, we decline to disturb the Board's decision on this basis.

### III. Intervention

¶24 Carlsen next argues that the district court erred when it granted the Smiths' motion to intervene as a matter of right in the proceeding before the district court. In particular, Carlsen argues that the Smiths' motion to intervene was untimely. The district court's decision to grant or deny a motion to intervene as a matter of right is reviewed under a correction of error standard. *See In re Marriage of Gonzalez*, 2000 UT 28, ¶ 16, 1 P.3d 1074. However, whether a motion to intervene is timely is reviewed for an abuse of discretion. *See Republic Ins. Grp. v. Doman*, 774 P.2d 1130, 1131 (Utah 1989).

¶25 The Smiths moved to intervene in the proceeding before the district court approximately seven months after Carlsen petitioned for judicial review of the Board's decision, and their motion was filed days after Carlsen moved for summary judgment against the City. In support of the motion to intervene, the Smiths and the City explained that the City had decided not to aggressively contest Carlsen's petition for judicial review because "[t]he City is really only an ancillary party in this case, and the decision in this case really doesn't impact the City [but] . . . affects . . . the Smiths' animal rights [o]n their own" property. The Smiths explained that "as soon as the[y] were notified that the City really didn't have an interest in pursuing this matter any further," they obtained legal counsel and "filed a motion to intervene" "within . . . a week['s] time." The Smiths and the City further explained that the Smiths' delay in

filing their motion to intervene was due to the City's delay in reaching its decision on how to approach Carlsen's petition for judicial review. And the City's delay was largely attributable to its move into a new office building, which disrupted its ability to "follow[] th[e case] more closely." The City also attempted to resolve the matter with Carlsen informally, which further prolonged the proceeding.

¶26 Rule 24(a) of the Utah Rules of Civil Procedure, which addresses "[i]ntervetion of right," provides,

> Upon timely application anyone shall be permitted to intervene in an action . . . when the applicant claims an interest relating to the property . . . which is the subject of the action and he is so situated that the disposition of the action may as a practical matter impair or impede his ability to protect that interest, unless the applicant's interest is adequately represented by existing parties.

Utah R. Civ. P. 24(a). "[A] court must allow a party to intervene if that party can establish that (1) its motion to intervene is timely, (2) the party has an interest in the subject matter of the litigation, (3) the party's interest is or may be inadequately represented [if their intervention is not permitted], and (4) the party is or may be bound by a judgment in the action." *Parduhn v. Bennett*, 2005 UT 22, ¶ 13, 112 P.3d 495 (internal quotation marks omitted).

¶27 In addressing the motion to intervene, the district court concluded that the Smiths had "sufficient interest" to intervene because the Board's decision directly affected rights they claimed to have on their property. The court also reasoned that excluding the Smiths from the proceeding would "impair or impede [their] ability to protect their interest." The court concluded, as well, that "allow[ing] the Smiths . . . to intervene . . . will not [cause] any undu[e] delay or prejudice to . . . Carlsen." The district court acknowledged, however, that it was "concerned" about the nearly seven months that had passed between the filing of the case and the Smiths' motion to intervene.

¶28 "'Use of the word 'timely' in . . . [r]ule [24(a)] requires that the timeliness . . . be determined under the facts and circumstances of each particular case,'" a determination that is "'in the sound discretion of the district court.'" *Republic Ins. Grp.*, 774 P.2d at

1131 (quoting *Jenner v. Real Estate Servs.*, 659 P.2d 1072, 1073-74 (Utah 1983)). In deciding that the Smiths' intervention would not cause undue delay or prejudice to Carlsen, the district court essentially concluded that the Smiths' motion was not untimely. The circumstances support such a conclusion: the Smiths' decision to intervene in the proceeding was contingent upon the City reaching a decision on how to approach Carlsen's petition for judicial review, and the City's decision was delayed due to its move into a new office building as well as its attempt to resolve the issue with Carlsen informally. Further, the record of the proceeding before the Board was not transmitted to the district court until seven months after Carlsen petitioned for judicial review, only just over a week before Carlsen and the Smiths filed their respective motions.[6] Transmission of the record was similarly delayed due to the City's move into a new office building, which hindered its ability to transcribe the hearing that was held before the Board. The record, particularly the transcript, was essential to Carlsen's petition for judicial review. Thus, it seems that the proceeding would have been prolonged due to the delay in transmitting the record to the district court, regardless of the Smiths' motion to intervene. Based on these circumstances, we cannot say that the district court abused its discretion in finding that the Smiths' motion to intervene was timely.

¶29 Otherwise, we see no error in the district court's decision to grant the Smiths' motion to intervene. The Smiths had an interest in the proceeding concerning the existence of a nonconforming animal rights use on the Property, and they would be bound by the outcome of the district court's judicial review. Further, the Smiths'

---

[6]Carlsen separately argues that the record transmitted to the district court "was not accurate and was incomplete." *See generally* Utah Code Ann. § 10-9a-801(7)(a) (2009) (providing that the land use authority whose decision is being reviewed "shall transmit to the reviewing court the record of its proceedings, including its minutes, findings, orders, and, if available, a true and correct transcript of its proceedings"). In essence, Carlsen complains that rather than transmitting the entire record in its original form, photocopies of documents in the record were transmitted to the district court, which resulted in the omission of highlighting on some documents and also resulted in color photographs appearing as black and white photographs. However, Carlsen has not alleged that he was harmed by the omission of color and highlighting, nor can we identify any substantive alteration to the record that inhibits our review of the issues he raises.

interest may have been inadequately represented had they not been permitted to intervene because the City was unable or unwilling to allocate resources to the case, nor was the City particularly interested in the case being resolved in its favor. We therefore conclude that the district court acted appropriately in granting the Smiths' motion to intervene.

## IV. Conclusion

¶30    In conclusion, the Board's decision to recognize an existing nonconforming animal rights use on the Property is not arbitrary, capricious, or illegal because that decision is not contrary to the governing law and is supported by substantial evidence. In addition, Carlsen has not adequately demonstrated that a member of the Board should have been disqualified for bias. Further, we conclude that the district court acted within its discretion in determining that the Smiths' motion to intervene was not untimely and otherwise appropriately granted the Smiths' motion to intervene.

¶31    Accordingly, we decline to disturb the Board's decision and affirm the district court's grant of the Smiths' motion to intervene.

_____
Stephen L. Roth, Judge


-----


¶32    WE CONCUR:


_____
J. Frederic Voros Jr.,
Associate Presiding Judge


_____
Michele M. Christiansen, Judge


20110142-CA                    16