2013 UT App 119

# THE UTAH COURT OF APPEALS

HOWARD HATCH,
Plaintiff and Appellant,
*v.*
KANE COUNTY BOARD OF ADJUSTMENT AND KANE COUNTY,
Defendants and Appellees.

Memorandum Decision
No. 20110199-CA
Filed May 9, 2013

Sixth District, Kanab Department
The Honorable Wallace A. Lee
No. 090600058

Howard Hatch, Appellant Pro Se
Jim R. Scarth and Kent A. Burggraaf, Attorneys for
Appellees

JUDGE STEPHEN L. ROTH authored this Memorandum Decision, in
which JUDGES JAMES Z. DAVIS and WILLIAM A. THORNE JR.
concurred.

ROTH, Judge:

¶1     Petitioner Howard Hatch appeals the district court's grant
of summary judgment to Defendants Kane County (the County)
and the Kane County Board of Adjustment (the Board). In granting
summary judgment, the court declined to disturb the Board's
decision to deny Mr. Hatch's application for a building permit on
the basis that the property on which Mr. Hatch intended to build
had been improperly subdivided. We similarly decline to disturb
the Board's decision.

¶2     Mr. Hatch applied to the County for a permit to build a
structure on a 40-acre parcel of land that is part of a larger property

known as the Stevens Canyon Estates. The County denied Mr. Hatch's application on the basis that the Stevens Canyon Estates property, and in particular the 40-acre parcel, had been improperly subdivided. Mr. Hatch appealed the County's decision to the Board, but the Board agreed with the County that the property had been improperly subdivided. Mr. Hatch petitioned for judicial review of the Board's decision in the district court. The court granted summary judgment to the County, concluding that the Board's decision was not arbitrary, capricious, or illegal. Mr. Hatch now appeals, challenging the Board's decision to deny his application for a building permit as well as certain other issues that arose in the district court proceeding. We first address Mr. Hatch's challenge to the Board's decision to deny his application for a building permit. We then address the other issues Mr. Hatch raises on appeal.

I. Denial of Mr. Hatch's Application for a Building Permit

¶3    Although this appeal comes to us from the district court's review of the Board's decision, "we review the Board's decision as if the appeal had come [to us] directly." *Patterson v. Utah Cnty. Bd. of Adjustment*, 893 P.2d 602, 603 (Utah Ct. App. 1995). In reviewing the Board's decision, we "determine only whether or not the decision . . . is arbitrary, capricious, or illegal." *See* Utah Code Ann. § 17-27a-801(3)(a) (LexisNexis 2009); *see also Patterson*, 893 P.2d at 603–04. "[T]he Board's decision can only be considered arbitrary or capricious if *not* supported by substantial evidence," which is "that quantum and quality of relevant evidence that is adequate to convince a reasonable mind to support a conclusion." *Patterson*, 893 P.2d at 604 & n.6 (citation and internal quotation marks omitted). In contrast, whether the Board's decision is illegal depends upon proper interpretation and application of the law. *Id.* at 604.

¶4    Mr. Hatch challenges the Board's denial of his application for a building permit, asserting that he properly subdivided the Stevens Canyon Estates property in approximately 1972 under the

subdivision ordinance that was in effect at that time.[1]According to Mr. Hatch, that version of the ordinance permitted agricultural property to be subdivided into lots of 10 or more acres without being subject to the County's subdivision requirements.[2] In

---

[1]Mr. Hatch does not specify whether he is challenging the Board's decision on the basis that it is arbitrary and capricious because it is not supported by substantial evidence or on the basis that it is illegal. On the one hand, he argues that the Board misapplied the law and erroneously concluded that his property had been improperly subdivided. On the other hand, Mr. Hatch also argues that in denying his application for a building permit, the Board "effectively excluded" certain evidence upon which he had relied. Based on our review of the record, it does not appear that any of this evidence was actually excluded. Rather, the Board simply did not give that evidence the weight Mr. Hatch thought it deserved. We therefore construe Mr. Hatch's argument to be that the Board should have given more weight to the evidence he relied upon, meaning that he is essentially making a substantial evidence argument.

> [2]The subdivision ordinance in effect in 1972 provides, Subdivision shall mean the division of a tract, or lot or parcel of land into three or more lots, plots, sites or other divisions or land for the purpose, whether immediate or future, of sale or of building development or redevelopment, provided, however, that divisions of land for agricultural purposes . . . shall be exempt.

That ordinance further provides, "A division of land for agricultural purposes shall mean a division of a parcel into three or more lots, none of which is smaller than ten acres." The ordinance then sets forth the procedure for subdividing property: "Before dividing any tract of land into three or more lots of ten acres or less in size, a subdivider shall," among other require-

(continued...)

contrast, the parties do not dispute that the Stevens Canyon Estates property would be subject to the County's current subdivision requirements were it subdivided today.[3] As evidence that he subdivided the Stevens Canyon Estates property under the 1972 ordinance, Mr. Hatch provided a letter written in December 1972 by Tex R. Olsen, who was the County Attorney at that time.[4] In that letter, Olsen wrote,

> [The County] ha[s] adopted a [s]ubdivision [o]rdinance which requires subdivision plats to be approved by the County . . . if three or more lots are subdivided for development or sale. The ordinance specifically exempts property held for agricultural purposes.
>
> The ordinance under discussion also states, "A subdivision of land for agricultural purposes shall mean a division or a parcel into three or more lots, none of which is smaller than ten acres." It has been the interpretation of [the County] that property divided into parcels of ten acres or more are not subject to the subdivision requirements and not regulated under the . . . [s]ubdivision [o]rdinance.

---

[2](...continued)
ments, submit a preliminary plat and a final plat to the County for review and approval and record the final plat with the County.

[3]In particular, to comply with the current ordinance, the parcels would have to be at least 35 acres in size.

[4]This letter was written to the Real Estate Division of Utah. According to Mr. Hatch, it was written for the purpose of allowing him to obtain permission to sell the subdivided parcels to the public.

> The Stevens Canyon Estates property has been
> divided into parcels of 10 acres or more and therefore
> is not subject to regulations by the County . . . .

Mr. Hatch explains that although the subdivision of the Stevens Canyon Estates property would not comply with the current subdivision ordinance, he properly subdivided the property in 1972 under the ordinance then in effect, thus grandfathering in the subdivided lots. He therefore asserts that the Board's decision to deny his application for a building permit on the basis that the property had been improperly subdivided is arbitrary, capricious, and illegal.

¶5 There are some significant unresolved problems, however, that call into question the conclusion that the Stevens Canyon Estates property was properly subdivided in 1972 under the ordinance in effect at that time. First, Mr. Hatch and the County dispute the extent of oversight and control the County could exercise over Mr. Hatch's efforts to subdivide the Stevens Canyon Estates property in 1972. According to the County, in subdividing the property under the subdivision ordinance in effect in 1972, Mr. Hatch was required to obtain review and approval of the subdivision by the County and was also required to record a plat map of the subdivision with the County. The County thus emphasizes that there is no evidence that the subdivision was ever reviewed or approved by the County,[5] and Mr. Hatch never recorded with the County a plat map showing how he purportedly subdivided the property in 1972. Indeed, the subdivision scheme is reflected only in a preliminary plat map that is in Mr. Hatch's

---

[5]Mr. Hatch relies on a minute entry from a planning commission meeting in 1972 as evidence that the County reviewed the proposed subdivision of the Stevens Canyon Estates property. However, that minute entry refers to a separate property, called the North Fork Estates, and not the Stevens Canyon Estates.

possession and was also never recorded. The first time the County saw this preliminary plat map was when Mr. Hatch applied for the building permit at issue in this case and again when the hearing was held before the Board to review the County's denial of his building permit application. Mr. Hatch has pointed out, however, that Olsen states in his letter that subdivision of agricultural property into lots of 10 or more acres was not subject to regulation by the County under the subdivision ordinance in effect at that time. Mr. Hatch therefore takes the position that he could subdivide the property under the 1972 ordinance without any oversight from the County, so long as his subdivision complied with the requirements of that ordinance, i.e., a division into parcels of 10 or more acres.

¶6     Second, it is disputed whether the 1972 ordinance applied only to property that was zoned as agricultural or to property that, while not zoned agricultural, had agriculture as a permitted use. The Stevens Canyon Estates property was not then and is not now zoned as agricultural; rather, it is zoned as forest/recreational. But in 1972, "agricultural" was a permitted use of property zoned as forest/recreational. Thus, depending on whether the 1972 ordinance applies to property that is zoned as agricultural or property that could permissibly be used for agricultural purposes, the Stevens Canyon Estates property may not have been eligible for subdivision under the 1972 ordinance.[6]

---

[6]Mr. Hatch asserts that the Stevens Canyon Estates property was eligible for subdivision under the 1972 ordinance. Mr. Hatch points out that, in the letter, Olsen quoted the 1972 ordinance and explained that it applied to land held for "agricultural purposes." *See supra* ¶ 4. And Mr. Hatch also points out that at the time he purportedly subdivided the Stevens Canyon Estates property under the 1972 ordinance, using property for "agricultural purposes" was a permitted use of property zoned as forest/recreational, as was the Stevens Canyon

(continued...)

¶7     And third, some of the parcels of the Stevens Canyon Estates property, as it was purportedly subdivided by Mr. Hatch in 1972, as shown on his preliminary plat map, are less than 10 acres in size. Indeed, the County identified as many as 10 parcels on Mr. Hatch's plat that were less than the requisite 10 acres. Thus, that subdivision scheme would not have complied with the 1972 ordinance, which requires that the subdivided parcels be 10 or more acres.

¶8     Rather than resolving these issues, however, we assume for purposes of our analysis that the subdivision of the Stevens Canyon Estates property in 1972 was valid as depicted on Mr. Hatch's preliminary plat map. We nevertheless conclude that the Board's decision to deny Mr. Hatch's application for a building permit is not arbitrary, capricious, or illegal.

¶9     It is undisputed that the 40-acre parcel does not exist as a platted lot on Mr. Hatch's preliminary plat map of the Stevens Canyon Estates, the property that was the subject of Olsen's letter. The County has emphasized that the 40-acre parcel was not identified as a lot in either the preliminary plat map in Mr. Hatch's

---

[6](...continued)
Estates property. Indeed, the ordinance itself uses the phrase "agricultural purposes," defining that phrase as "a division of a parcel into three or more lots, none of which is smaller than ten acres."

The County, however, takes the position that this ordinance was only applicable to property actually zoned as agricultural. If this is the case, it is puzzling why Olsen would represent that the Stevens Canyon Estates property could be properly subdivided under the 1972 ordinance, despite it being zoned as forest/recreational rather than agricultural. The County suggests, however, that Olsen may have confused the Stevens Canyon Estates property with another property Mr. Hatch was simultaneously subdividing, which was zoned as agricultural.

possession or the plat map the County had on record. Indeed, Mr. Hatch admits that the 40-acre parcel "doesn't conform with the original idea of how the lots would be split off" as reflected by his preliminary plat map. Instead, he explained that "[he] arbitrarily took a 40 acre piece" and "parceled that off," either by combining existing lots or completely redrawing boundary lines. And it is also undisputed that Mr. Hatch did not seek the County's approval in creating the 40-acre parcel.

¶10    Mr. Hatch does not view these facts as problematic, however. Rather, he relies on the concept of nonconformity[7] to

---

[7]More precisely, Mr. Hatch argues that the subdivision of the Stevens Canyon Estates property has been grandfathered in, relying on the concept of nonconformity, and in particular analogizes nonconforming lots to nonconforming uses. In arguing for the applicability of the legal concept of nonconforming use to the question of the validity of subdivided lots, Mr. Hatch originally explained to the Board, through his attorney, that "[p]reexisting nonconforming uses have been abundantly addressed in Utah" but "preexisting nonconforming lots have not been addressed in Utah." Mr. Hatch explained that nonconforming lots "have been addressed in many other states" but the "issue . . . hasn't come before the courts in Utah." According to Mr. Hatch, "[e]very court that addresses . . . preexisting nonconforming lots treats them the same as preexisting nonconforming uses." However, no specific authority on nonconforming lots was presented to the Board. Rather, Mr. Hatch relied only on the statutory definition of nonconforming uses and the County's ordinance on nonconforming uses. *See* Utah Code Ann. § 17-27a-103(36) (LexisNexis Supp. 2012) (defining nonconforming use).

On appeal, Mr. Hatch continues to rely on the concept of nonconformity in arguing the validity of the 40-acre lot, though as a pro se appellant he does so without presenting any of the

(continued...)

assert that the 1972 ordinance continues to exempt the Stevens Canyon Estates property from any regulation by the County, allowing him to perpetually reconfigure and redraw the subdivided parcels without any official oversight or approval by the County so long as the newly-created parcels are 10 acres or greater, as provided in the 1972 ordinance. These arguments, however, misperceive how the concept of nonconformity applies to the issue at hand.

¶11 Generally, a nonconforming use is "a use of land that" "legally existed before its current land use designation," "has been maintained continuously since the time the land use ordinance regulation governing the land changed," and, "because of one or more subsequent land use ordinance changes, does not conform to the regulations that now govern the use of the land." Utah Code Ann. § 17-27a-103(36) (LexisNexis Supp. 2012); *see also Black's Law Dictionary* 1682 (9th ed. 2009) (defining "nonconforming use" as a "[l]and use that is impermissible under current zoning restrictions but that is allowed because the use existed lawfully before the restrictions took effect").[8] Based on this definition, in order for a

_____

[7](...continued)
authority referred to by his attorney at the hearing before the Board. We accept for purposes of appeal that the general principles of nonconforming use apply to a nonconforming subdivision or nonconforming lots, but because of the way we resolve this appeal, we do not decide that issue.

[8]The County's own nonconforming use ordinance provides,

The nonconforming use of land, existing at the time [the current ordinance] became effective, may be continued, provided that no such nonconforming use of land shall in any way be expanded or extended either on the same or on adjoining land, or any portion thereof, is

(continued...)

nonconforming use to retain its lawful character once the applicable law changes, it must continue in essentially the same form as when it began. Thus, a change to or abandonment of a nonconforming use may result in the property becoming subject to the version of the law currently in effect. *See, e.g., Harris v. Springville City*, 712 P.2d 188, 188–89 (Utah 1984) (concluding that a nonconforming use was expanded in violation of the current ordinance where the nature of the business changed from manufacturing burial vaults and septic tanks to making ice); *Carlsen v. Board of Adjustment*, 2012 UT App 260, ¶¶ 13–19, 287 P.3d 440 (concluding that the nonconforming use of keeping animals on the subject property was sufficiently maintained and, therefore, could continue despite a change in the applicable ordinance); *Vial v. Provo City*, 2009 UT App 122, ¶ 24, 210 P.3d 947 (reasoning that because a basement apartment allowed as a nonconforming use was not continuously maintained, the property was subject to the current ordinance, which did not permit such use). And, thus, assuming the applicability of nonconforming use principles to nonconforming lots as Mr. Hatch does here, *see generally Black's Law Dictionary* 1032 (9th ed. 2009) (defining a "nonconforming lot" as "[a] previously lawful lot that now violates an amended or newly adopted zoning ordinance"), a subdivision otherwise lawfully created may continue to exist in its original form but a material change in lot configuration may invoke the differing restrictions of the current ordinance.

¶12    Assuming the legality of the subdivision of the Stevens Canyon Estates property that Mr. Hatch created under the 1972 ordinance, as reflected by his preliminary plat map, it is the lots identified in the subdivision at that time that fall under the ongoing

---

[8](...continued)
abandoned for a period of one year or more, any future use of such land shall be in conformity with the provisions of [the ordinance currently in effect], unless such use is approved for nonconforming use by [the County].

protection of the principle of nonconformity, not the process of subdivision that initially resulted in their creation. Rather, the process of subdivision that was used to create the nonconforming lots is relevant only to determine whether those lots were, in fact, lawfully created at the time they were created. That those lots remain legal now, even though they could not be created under current law in the same way they were under the prior law, does not mean that the property can be divided into new lots indefinitely, irrespective of current ordinances. Instead, division of the property into new lot configurations subsequent to the original creation of the subdivision would be subject to whatever ordinance was in effect at the time of the proposed change, as would the creation of a new and materially different lot within the subdivision boundaries.

¶13    The 40-acre parcel at issue was not created during the original subdivision of the Stevens Canyon Estates property into lots of about 10 acres or less; rather, it is a newly created lot within the boundaries of the original subdivision. As a consequence, the creation of the new, much larger lot and the resulting internal reconfiguration of the subdivision does not fall within whatever grandfathered status the subdivision may have had up to that point, but is subject to the current ordinance governing the subdivision of such property. There is no dispute that Mr. Hatch has not yet complied with the ordinance currently in force. Accordingly, we conclude that the Board's decision to deny Mr. Hatch's application for a building permit on the basis that the 40-acre parcel was improperly subdivided is not arbitrary, capricious, or illegal.

## II. Other Issues Raised on Appeal

¶14    In addition to challenging the Board's decision to deny his application for a building permit, Mr. Hatch takes issue with certain aspects of the proceedings before both the Board and the district court. We limit our analysis, however, to issues Mr. Hatch has specifically identified in his brief as challenged on appeal and

do not address other issues that he simply raises in the course of setting out his arguments. *See generally* Utah R. App. P. 24(a)(5) (requiring that the appellant include in the brief a "statement of the issues presented for review").

¶15 First, Mr. Hatch challenges the reliability of the transcript of the hearing held before the Board. He points out that there are numerous places throughout the hearing where the transcript only reads, "Inaudible." But Mr. Hatch has not identified any information that was omitted from the transcript to his detriment, nor has he identified any error caused by these omissions in the transcript. Rather, all the information that he relies upon appears to be available in the record. *See generally* Utah Code Ann. § 17-27a-801(7) (LexisNexis 2009) (providing that the county appeal authority "shall transmit to the reviewing court the record of its proceedings," which may include "a true and correct transcript" of any tape-recorded proceeding).

¶16 Mr. Hatch also argues that certain evidence that he relied upon was "effectively excluded." *See supra* ¶ 4 n. 1. Reading this argument in conjunction with his challenge to the reliability of the transcript, Mr. Hatch appears to be making a broader argument that the district court should have conducted an evidentiary hearing to "clarify" the issues raised by Mr. Hatch. However, judicial review of the Board's decision "is limited to the record" of the proceedings that were held before the Board. *Id.* § 17-27a-801(8)(a)(i); *see also id.* § 17-27a-801(7) (providing that the Board "shall transmit to the reviewing court the record of its proceedings, including its minutes, findings, orders and, if available, a true and correct transcript of its proceedings"). In conducting a judicial review of the Board's decision, "[t]he court may not accept or consider any evidence outside the record . . . unless that evidence was offered . . . and the court determines that it was improperly excluded." *Id.* § 17-27a-801(8)(a)(ii). For these reasons, the district court declined to hold an evidentiary hearing, and Mr. Hatch has not challenged the basis for that decision. More importantly, he has not shown that any evidence he offered to the Board was actually

excluded.[9] Therefore, the district court did not err in declining to admit new evidence.

¶17   Second, Mr. Hatch challenges the district court's decision to grant summary judgment on a regulatory takings claim he raised in his complaint in addition to his petition for judicial review of the Board's decision.[10] But, although Mr. Hatch clearly takes issue with the fact that the district court granted summary judgment on the regulatory takings claim, he does not identify any error in the court's decision. Indeed, he seems to concede that after disposing of his petition for review as it did, the district court's rejection of his regulatory takings claim was inevitable. Because Mr. Hatch does not identify a specific error in the court's decision to grant summary judgment on the regulatory takings claim, our review can proceed no further. *See generally Allen v. Friel*, 2008 UT 56, ¶ 7, 194 P.3d 903 ("If an appellant fails to allege specific errors of the lower court, the appellate court will not seek out errors in the lower court's decision.").

¶18   Third, Mr. Hatch challenges the legitimacy of the Board's written findings and conclusions.[11] He argues that the County improperly authored findings and conclusions for the Board after it had rendered its final decision at the hearing and after Mr. Hatch had petitioned for judicial review of the Board's decision in the district court. He perceives that these findings and conclusions

---

[9]Indeed, much of the evidence that Mr. Hatch presented to the district court in requesting an evidentiary hearing was evidence that he did not offer to the Board.

[10]The regulatory takings claim was bifurcated from Mr. Hatch's petition to review the Board's decision, and the court granted summary judgment to the County on that claim after disposing of Mr. Hatch's petition for review.

[11]In the district court, Mr. Hatch filed a motion to strike the Board's written decision, which the district court denied.

reflect the County's own reasoning for the decision rather than that of the Board and were crafted for the purpose of legitimizing the Board's decision in the County's favor after that decision was appealed. However, these arguments seem to be based on a misunderstanding of the process of drafting the findings and conclusions that are incorporated into a document that ultimately is entered as the Board's final decision.

¶19     The Utah Code provides that the Board's decision "takes effect on the date when [it] issues a written decision." Utah Code Ann. § 17-27a-708(1) (LexisNexis 2009). That "written decision . . . constitutes a final decision." *Id.* § 17-27a-708(2). And "[a]ny person adversely affected by [that] final decision" "may file a petition for review of the decision with the district court within 30 days after the . . . decision is final," i.e., after a written decision is issued. *Id.* § 17-27a-801(2)(a).

¶20     In challenging the legitimacy of the findings and conclusions that constitute the Board's final decision, Mr. Hatch asserts that at the hearing the Board represented that it would not make any findings. However, as we have explained, the Board has a statutory duty to issue a written decision because the written decision constitutes the final decision that triggers the 30-day appeal period. *See id.* §§ 17-27a-708, -801(2)(a). Thus, in light of this statutory authority, the Board's statement is perhaps better interpreted as expressing its intent not to make oral findings on the record at that time and not a statement that it would make no findings at all, in abrogation of its statutory duty.[12]

---

[12]Notably, this is one of the places in the transcript where some of the statements are inaudible. Specifically, according to the transcript, Mr. Hatch's attorney at the time asked, "Did the Board have any specific findings in regards to its (inaudible) findings with regard to the (inaudible)." And the unattributed response is simply, "(Inaudible.)." We will assume for the sake of argument that the Board's response was simply, as Mr. Hatch

(continued...)

¶21    Mr. Hatch also treats the fact that the written findings and conclusions were not entered until after he had petitioned for judicial review in the district court as evidence of some sort of impropriety. Indeed, the hearing before the Board was held on April 9, 2009; Mr. Hatch filed his petition for judicial review on April 24, 2009; and the Board's written findings and conclusions were not entered until May 15, 2009. But that simple sequence of events does not establish, as Mr. Hatch suggests, that the County and the Board colluded to draft and issue written findings and conclusions only to legitimize a flawed decision in response to his appeal. Rather, Mr. Hatch appealed the Board's decision before it was final, i.e., before the Board had issued its written decision. *See id.* §§ 17-27a-708, -801(2)(a). So what Mr. Hatch perceives as suspect timing for the issuance of the written findings and conclusions more reasonably appears to be a result of his seeking review of the Board's determination before it was made final by the entry of the final written decision required by statute.

¶22    Mr. Hatch also takes issue with the fact that the County drafted the findings and conclusions for the Board. It is not uncommon, however, for a party (usually the prevailing party) to draft a written decision. That decision is then subject to review by the opposing party and acceptance or modification by the decision-making body before it is made final. *Cf.* Utah R. Civ. P. 7(f)(2) ("Unless the court approves the proposed order submitted with an initial memorandum, or unless otherwise directed by the court, the prevailing party shall . . . serve upon the other parties a proposed

---

[12](...continued)
asserts, "No." But we also do not think it reasonable to read into that response an intention by the Board to abrogate its statutory duty to issue a written decision. Even if that were the intention, the fact that the Board thereafter fulfilled that duty is not error, but correction of error, and Mr. Hatch has provided no authority that simply stops the clock at that original negative response.

order in conformity with the court's decision."). Here, the County Attorney drafted the written decision, explaining that the members of the Board, "as laypeople, were less suited to the task," and explained that he had "followed this practice consistently during [his] tenure as county attorney." Once it was drafted, the County Attorney submitted the written decision to Mr. Hatch for his review on three separate occasions, asking that Mr. Hatch respond if he had "any proposed changes, objections or additions." Mr. Hatch's objections, however, were not to the form of the proposed decision or its language, but instead raised essentially the same issues with regard to the substance of the decision as in the district court and on appeal. The County Attorney then submitted the proposed written decision to the Board, which reviewed and signed it. The County Attorney explained that he had no direct contact with the Board when preparing and delivering the written decision. Mr. Hatch has shown no impropriety in the process through which the Board entered its final written decision, and his remedy for any error that might have arisen in the process of translating the Board's oral ruling into a written decision lies in his right to petition for review in the district court and this court, which he has done.

¶23    Ultimately, we agree with the district court that the Board's written findings "appear to be a fair, written memorialization of [its] decision." Accordingly, as did the district court, we decline Mr. Hatch's request to strike the Board's written decision.

### III. Conclusion

¶24    We conclude that the Board's decision to deny Mr. Hatch a building permit on the basis that the 40-acre parcel in the Stevens Canyon Estates property was improperly subdivided is not arbitrary, capricious, or illegal. We further conclude that Mr. Hatch has failed to identify any material error in either the substance of the Board's decision or the process by which it was reached. We therefore decline to disturb the Board's decision.

———